IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| QWEST COMMUNICATIONS CORPORATION, | ) ) ) | 8:07CV430 |
| Plaintiff, | ) ) | **MEMORANDUM** |
| v. | ) ) | **AND ORDER** |
| GERALD L. VAP, ANNE C. BOYLE, TIMOTHY SCHRAM, ROD JOHNSON, and FRANK LANDIS, JR., in their official capacities as the Commissioners of the Nebraska Public Service Commission, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This is an action filed under Section 252(e)(6) of the Telecommunications Act of 1996 [1] to determine whether a rate order entered by the Nebraska Public Service Commission on October 20, 2007, modifying the rates that Qwest Communications Corporation, as an incumbent local exchange carrier, can charge competitors for unbundled access to its "local loops" (*i.e.*, the wires and cables that connect residential and business customers to Qwest's central offices in various localities),[2]

---

[1] Section 252 of the Act provides that "[i]n any case in which a State commission makes a determination under this section, any party aggrieved by such determination may bring an action in an appropriate Federal district court to determine whether the . . . statement meets the requirements of section 251 of this title and this section." 47 U.S.C. § 252(e)(6).

[2] "The local loop network element is defined as a transmission facility between a distribution frame (or its equivalent) in an incumbent LEC central office and the loop demarcation point at an end-user customer premises." 47 C.F.R. § 51.319(a). A "central office" is a "switching unit, in a telephone system which provides service

meets the requirements of Sections 251(c)(3) [3] and 252(d)(1) [4] of the Act. Among other things, Qwest complains that the modified rates, which differentiate between "in-town" and "out-of-town" customers, are not based on an acceptable cost study, but instead are based on a flawed mathematical formula that attempts to reallocate costs using a single variable of household density.[5] Although Qwest makes a good case for setting aside the rate order, I will defer to the Commission's judgment.

## I.  BACKGROUND

In *AT&T Corp. v. Iowa Utilities Bd.*, 525 U.S. 366, 384-85 (1999), the Supreme Court upheld the Federal Communications Commission's jurisdiction to impose a new methodology on States when setting rates under §251(d)(1). "[T]he Act requires

---

to the general public, having the necessary equipment and operations arrangements for terminating and interconnecting subscriber lines and trunks . . ..  There may be more than one central office in a building." 47 C.F.R. Pt. 36, Appx.

[3] Under Section 251 of the Act, each "incumbent local exchange carrier" has "[t]he duty to provide, to any requesting telecommunications carrier for the provision of a telecommunications service, nondiscriminatory access to network elements on an unbundled basis at any technically feasible point on rates, terms, and conditions that are just, reasonable, and nondiscriminatory . . .." 47 U.S.C. § 251(c)(3).

[4] "Determinations by a State commission of . . . the just and reasonable rate for network elements for purposes of subsection (c)(3) of such section [251] . . . (A) shall be . . .(i) based on the cost (determined without reference to a rate-of-return or other rate-based proceeding) of providing the interconnection or network element (whichever is applicable), and (ii) nondiscriminatory, and (B) may include a reasonable profit." 47 U.S.C. § 252(d)(1).

[5] Qwest also alleges that the rate order is discriminatory because it does not apply to any other incumbent local exchange carriers and it disproportionately increases the rates for serving rural consumers in high cost areas, that the NPSC violated Qwest's rights to due process and equal protection, and that the NPSC violated the Nebraska Administrative Procedure Act.

2

the FCC to decide how to value 'the cost . . . of providing the . . . network element[6] [which] may include a reasonable profit," although the FCC is . . . forbidden to allow any 'reference to a rate-of-return or other rate-based proceeding,' § 252(d)(1). . . . [T]he Commission chose a way of treating 'cost' as 'forward-looking economic cost,' 47 CFR § 51.505 (1997), something distinct from the kind of historically based cost generally relied upon in valuing a rate base . . .. In Rule 505, the FCC defined the 'forward-looking economic cost of an element [as] the sum of (1) the total element long-run incremental cost of the element [TELRIC]; [and] (2) a reasonable allocation of forward-looking common costs,' § 51.505(a), common costs being 'costs incurred in providing a group of elements that 'cannot be attributed directly to individual elements,' § 51.505(c)(1). Most important of all, the FCC decided that the TELRIC 'should be measured based on the use of the most efficient telecommunications technology currently available and the lowest cost network configuration, given the existing location of the incumbent['s] wire centers.'[7] § 51.505(b)(1)." *Verizon Communications, Inc. v. F.C.C.*, 535 U.S. 467, 495 (2002). State commissions are required to "establish different rates for elements in at least three defined geographic areas within the state to reflect geographic cost differences." 47 C.F.R. § 51.507(f).

As further explained by the Court of Appeals in *Qwest Corp. v. Koppendrayer*, 436 F.3d 859, 862-63 (8th Cir. 2006):

---

[6] "Network element" is defined as "a facility or equipment used in the provision of a telecommunications service. Such term also includes features, functions, and capabilities that are provided by means of such facility or equipment, including subscriber numbers, databases, signaling systems, and information sufficient for billing and collection or used in the transmission, routing, or other provision of a telecommunications service." 47 U.S.C. § 153(29).

[7] "A wire center is the location of an incumbent LEC local switching facility containing one or more central offices, . . .. The wire center boundaries define the area in which all customers served by a given wire center are located." 47 C.F.R. § 51.5.

The 1996 Telecommunications Act ("1996 Act") was intended to create competition between carriers in local telecommunication service markets that had been traditionally dominated by a single monopoly carrier. Incumbent local exchange carriers ("ILECs"), such as Qwest, own the network infrastructure necessary to provide local telephone service. The 1996 Act requires ILECs to lease their networks to competitive local exchange carriers ("CLECs") and outlines procedures for determining lease rates. 47 U.S.C. §§ 251, 252. Section 252 allows ILECs and CLECs to negotiate lease terms themselves in the form of interconnection agreements ("ICAs"). § 252(a). However, if the parties cannot successfully negotiate a rate, state public utilities commissions have the authority to arbitrate rates.[8]  § 252(b).

FCC rules require state public utilities commissions to establish rates based on a cost methodology called Total Element Long Run Incremental Cost ("TELRIC"). *See Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15,499 ¶¶ 674-90 (FCC Aug. 8, 1996) ("Local Competition Order"). Under TELRIC, unbundled network element ("UNE") rates are not set based on an ILEC's actual costs in building and maintaining its network. Rather, UNE rates are calculated according to what it would cost today to build and operate an efficient network that can provide the same services as the ILEC's existing network. In this way, UNE rates can provide accurate market signals to inform CLECs' decisions about whether to invest in their own facilities or lease the ILEC's facilities.

---

[8] The present case involves rulemaking by the NPSC rather than the arbitration of a dispute between Qwest and a CLEC. "States may review a TELRIC economic cost study in the context of a particular arbitration proceeding, or they may conduct such studies in a rulemaking and apply the results in various arbitrations involving incumbent LECs." *In the Matter of Implementation of the Local Competition Provisions in the Telecommunications Act of 1996*, First Report and Order, 11 F.C.C.R. 15,499, 15,851 ¶ 693 (FCC Aug. 8, 1996) ("Local Competition Order").

### A. Application No. C-2516/PI49 ("C-2516 Docket")

Qwest's unbundled network element ("UNE") loop rates were first established by the Nebraska Public Service Commission ("NPSC") in 2002. *See In the Matter of the Commission, on its own motion, to investigate cost studies to establish Qwest Corporation's rates for interconnection, unbundled network elements, transport and termination, and resale*, Application No. C-2516/PI49 ("C-2516 Docket"), Findings and Conclusions (Apr. 23, 2002), Administrative Record at 1-61 (Exhibit A). As had been recommended by its staff, the NPSC set the rates by averaging the results of three different cost studies (using the Hatfield ("HAI") cost model, the Hybrid Cost Proxy Model ("HCPM"), and the Benchmark Cost Proxy Model ("BCPM")). Qwest's 69 wire centers were divided into three geographic areas using a statistical cluster analysis of the loop costs, and those costs were then averaged to establish a rate for each area. The monthly loop lease rates were as follows: Zone 1 (urban),[9] $15.14; Zone 2 (towns),[10] $35.05; and Zone 3 (rural),[11] $77.92.

Qwest later reduced these rates by 20% in conjunction with an application submitted to the FCC for authority to provide in-region, long distance service under

_____

[9] Zone 1 included 18 wire centers located in Elkhorn, Fremont, Grand Island, North Platte, Norfolk, Omaha, South Sioux City, and Wayne. *See* C-2516 Order (Exhibit A), p. 61, Administrative Record at 61.

[10] Zone 2 included 16 wire centers located in Bennington, Chadron, Central City, Gretna, Holdrege, Lexington, McCook, Minden, Ogallala, Schuyler, Sidney, Springfield, St. Paul, Tekamah, Valley, and West Point. *See id.*

[11] Zone 3 included 35 wire centers located in Alliance, Ainsworth, Atlanta, Atkinson, Axtell, Big Springs, Broken Bow, Bridgeport, Cairo, Clarkson, Crawford, Elwood, Elm Creek, Emerson, Farwell, Fullerton, Gothenburg, Humphrey, Homer, Harrison, Howells, Laurel, Loup City, Lyons, Oakland, O'Neill, Oxford, Pilger, Pender, Randolph, Silver Creek, St. Libory, Valentine, Wood River, and Wakefield. *See id.*

Section 271 of the Telecommunications Act. *See In re Qwest Communications Int'l, Inc., 17 F.C.C.R. 26303, ¶¶ 245-47 (Dec. 23, 2002)*. These rate reductions were approved by the NPSC in June 2002. *See id.*, ¶ 246; *In the Matter of the Commission, on its own motion, to investigate cost studies to establish Qwest Corporation's rates for interconnection, unbundled network elements, transport and termination, and resale*, Application No. C-2516/PI49, Compliance Filing Approved in Part and Denied in Part & Other Rates Declared Effective (June 5, 2002), Administrative Record at 62-65 (Exhibit B). Thus, the UNE loop rates that Qwest actually charged were: Zone 1, $12.14; Zone 2, $28.11; and Zone 3, $62.49.

## B. Application No. NUSF-26 ("NUSF-26 Docket")

In 2004, the NPSC decided to revise the mechanism for universal service funding in Nebraska[12] to provide "highly target[ed] support to the most costly and sparsely populated out-of-town service areas[.]" *In the Matter of the Nebraska Public Commission, on its own motion, seeking to establish a long-term universal service funding mechanism*, Application No. NUSF-26 ("NUSF-26 Docket"), Findings and Conclusions (Nov. 3, 2004) ("NUSF-26 Order"), p. 4 ¶ 11, Administrative Record at 69 (Exhibit C). The NPSC proposed to support only out-of-town residential service and to use a new method (the NUSF Support Allocation Methodology ("SAM")) for allocating funds to carriers providing such service based on relative loop costs.

"The SAM utilizes 2000 Census household data, by census block, collected by the U.S. Bureau of Census, to create support areas. The SAM utilizes the Benchmark Cost Proxy Model (BCPM), Version 3.1, and a common set of inputs, to calculate

---

[12] A Nebraska Universal Service Fund ("NUSF") surcharge is assessed on all end-user telecommunications services provided in Nebraska intrastate commerce. *See* 291 Nebr. Admin. Code Ch. 10, § 002.01. NUSF funding is provided to eligible telecommunications carriers that provide local exchange service in support areas designated by the NPSC. *See* Neb. Rev. Stat. § 86-324(1).

household densities and estimate forward-looking loop costs. Econometric regression techniques are employed to link forward-looking loop costs to household density. Finally, with the use of the regression results and support area densities, expected loop cost is calculated for each support area." *In the Matter of the Nebraska Public Commission, on its own motion, seeking to establish a long-term universal service funding mechanism*, Application No. NUSF-26, Progression Order No. 5 (June 29, 2004), p. 11 ¶ 38, Administrative Record at 102 (Exhibit D). "The SAM compares expected loop cost, for each support area, to a loop cost benchmark.[13] When expected loop cost exceeds a loop cost benchmark, a base support amount for the support areas is calculated. Results are aggregated. Finally, each NETC's [Nebraska Eligible Telecommunication Carrier's] allocation of the Program loop support is calculated based on relative base support amounts." *Id.*, ¶ 39.

The SAM is not in evidence, and universal service funding is not directly at issue in this case. A close relationship exists, however, because the NPSC requires that support payments for leased local loops be "ported" from the incumbent local exchange carrier ("ILEC") to the competing local exchange carrier ("CLEC"). The NPSC froze the monthly portable support payments for residential lines at the following levels, for a 5-year transitional period: Zone 1, $0.57; Zone 2, $20.35; and Zone 3, $69.59.[14] *See* NUSF-26 Order (Exhibit C), p. 9 ¶ 27, Administrative Record at 74. Portable support payments for existing business lines were also continued under a "hold harmless" provision and frozen at the following levels during the transition period: Zone1, $0.00; Zone 2, $15.15; and Zone 3, $56.87. *See id.*, ¶ 29. No support payments are ported for business customers that were not previously being served by the CLEC. Comparing Qwest's UNE loop rates to the portable

---

[13] The residential access line benchmark was set at $17.50 per month, while the business access line benchmark was set at $27.50 per month. *See* NUSF-26 Order (Exhibit C), p. 4 ¶ 10, p. 10 ¶ 35, Administrative Record at 69, 75.

[14] These zones apparently correspond to Qwest's UNE loop rate zones.

support payments, it can be seen that the net cost to a CLEC for leasing a local loop from Qwest in order to provide residential service is as follows:  Zone 1, $11.57; Zone 2, $7.76; and Zone 3, ($7.10).  *See* Transcript, Exhibit 7 (Figure 1), Administrative Record at 771.  For "hold harmless" business lines, the net cost is: Zone 1, $12.14; Zone 2, $12.96; and Zone 3, $5.62.  For new business lines there is no NUSF support, so only the UNE loop rates apply:  Zone 1, $12.14; Zone 2, $28.11; and Zone 3, $62.49.  *See id.*  The following table summarizes these results:

|                  | Zone 1 | | Zone 2 | | Zone 3 | |
| --- | --- | --- | --- | --- | --- | --- |
|                  | Res. | Bus. | Res. | Bus. | Res. | Bus. |
| UNE loop rate    | $12.14 | $12.14 | $28.11 | $28.11 | $62.49 | $62.49 |
| Ported NUSF      | 0.57 | 0.00 | 20.35 | 15.15 | 69.59 | 56.87 |
| Net cost to CLEC | $11.57 | $12.14 | $7.76 | $12.96 | ($7.10) | $5.62 |

### C. Application No. C-3554/PI-112 ("C-3554 Docket")

In early 2006, the NPSC started a public investigation to determine whether to implement a staff proposal establishing "in-town" and "out-of-town" subzones for Qwest's UNE loop rates.  *See In the Matter of the Commission, on its own motion, seeking to investigate whether the zones established in Docket No. C-2516 are appropriate in light of NUSF-26 findings and conclusions*, Application No. C-3554/PI-112 ("C-3554 Docket"), Order Opening Docket (Feb. 28, 2006), Administrative Record at 156-59 (Exhibit H).  At the same time, the NPSC sought public comment on whether to adopt "a proposed Porting Method (PM), to develop NUSF portable support amounts consistent with the ["in-town" and "out-of-town"] support areas determined in Application No. NUSF-26."  *In the Matter of the Commission, on its own motion, to make adjustments to the universal service fund mechanism established in NUSF-26*, Application No. NUSF-50 ("NUSF-50 Docket"), Progression Order No. 2 (Feb. 28, 2006), p. 1 ¶ 5, Administrative Record at 151 (Exhibit G).  These proceedings were later consolidated, but the present case is only concerned with the rate order in the C-3554 Docket.

NPSC staff testified that the transitional system for porting support payments is "not competitively neutral" because "[i]t puts [Qwest] at a major disadvantage in zone 3 and at a significant disadvantage in zone 2" for providing residential service, and makes it impossible for a CLEC to compete for business customers in zone 3. *See* Transcript, 60:25-61:20, Administrative Record at 501-02. The elimination of NUSF support for serving "in-town" customers would create a further mismatch between Qwest's UNE loop rates and the portable support payments. NPSC staff therefore proposed "to match UNE zones with USF zones" and to establish the following rates and ported support payments, which allegedly would eliminate the "competitive non-neutrality" (except for out-of-town business customers, where the CLEC's net cost would drastically increase in all zones):

|  | Zone 1 | | Zone 2 | | Zone 3 | |
|---|---|---|---|---|---|---|
|  | In-Town | Out | In-Town | Out | In-Town | Out |
| UNE loop rate | $10.97 | $31.53 | $9.33 | $93.19 | $9.93 | $172.95 |
| Ported NUSF (residential) | 0.00 | 7.39 | 0.00 | 69.06 | 0.00 | 148.81 |
| Net cost to CLEC | $10.97 | $24.14 | $9.33 | $24.13 | $9.93 | $24.14 |

*See* Transcript, 61:21-63:15 & Exhibit 7 (Figure 2), Administrative Record at 502-04, 772. The ported NUSF payments shown in the table above are simply the differences between the proposed UNE loop rates and a benchmark cost of about $24.14. These are maximum payment amounts; if the amounts of per-line NUSF support that the ILEC actually receives are less than these amounts, then the CLEC would be paid the lesser amounts. *See* Exhibit G, pp. 2-3 ¶¶ 7-9, Administrative Record at 152-53.

As an alternative, the NPSC staff proposed combining the three "in-town" subzones into a single zone, with an averaged rate of $10.62. *See* NUSF-50 & C-3554 Dockets, Order Releasing Staff Proposal (Feb. 13, 2007), Administrative Record at 257 (Exhibit T). Following a hearing, the NPSC decided to adopt this alternative proposal, but with the rates recalculated to include business lines that had

9

not been included in the staff's analysis.[15]  The NPSC noted, after it was pointed out by Qwest, "that 47 CFR §51.503(c) requires that UNE prices assessed by an incumbent carrier 'shall not vary on the basis of class of customers served by the requesting carrier, or on the type of services that the requesting carrier purchasing such elements uses them to provide.'"  NUSF-50 & C-3554 Dockets, Order (Oct. 10, 2007) ("Rate Order"), p. 9, Administrative Record at 1028 (Exhibit TT).  The results of this recalculation were as follows:

|  | Zone 1 | | Zone 2 | | Zone 3 | |
|---|---|---|---|---|---|---|
|  | In-Town | Out | In-Town | Out | In-Town | Out |
| UNE loop rate | $10.76 | $37.04 | $10.76 | $95.32 | $10.76 | $210.90 |
| Ported NUSF (residential) | 0.00 | 12.90 | 0.00 | 71.18 | 0.00 | 186.76[16] |
| Net cost to CLEC | $10.76 | $24.14 | $10.76 | $24.14 | $10.76 | $24.14 |

---

[15] Certain other adjustments were also made.  For example, access lines for 9 wire center areas in Omaha were excluded from Zone 1 because Qwest is no longer required to provide UNEs to competitors in those areas.  *See* NUSF-50 & C-3554 Dockets, Order (Oct. 10, 2007) ("Rate Order"), p.10 n. 32, Administrative Record at 1029 (Exhibit TT), Administrative Record at 1029; Transcript Exhibit 8 (prepared testimony of Peter B. Copeland), pp. 17-18, Administrative Record at 792-93.  NPSC staff also substituted line counts for household counts in the recalculation, apparently in response to criticism from Qwest's expert that the staff was "using an apple and oranges approach."  See Transcript Exhibit 8, p 15, Administrative Record at 790.

[16] Qwest has filed a motion for leave to supplement the record to show that the reduced NUSF funding it will receive in 2008 would only permit payments to the CLECs of $8.12 in Zone 1, $36.41 in Zone 2, and $90.82 in Zone 3. (Filing 39.)  This showing would be made in support of an argument in its brief that the proposed rates do not promote competition for out-of-town customers, especially in Zone 3.  While this evidence is responsive to a counterargument  made by the defendants (who flatly assert that "the CLEC receives nearly $187 in ported NUSF support" for out-of-town residential lines in Zone 3 (filing 37, at CM/ECF p. 33)), I will deny the motion. The defendants object to the evidence because the parties stipulated that the matter  would be determined on the administrative record, as contemplated by 47 U.S.C. § 252(e)(6).  I conclude that the objection is well-taken.

*See id.*, Attachment A, Administrative Record at 1033.  In adopting these rates, the NPSC found that "Qwest should determine in-town and out-of-town customers on the basis of the NUSF-26 distribution model. . ..  Accordingly, in-town areas are cities, villages or unincorporated areas with 20 or more households and densities greater than 42 households per square mile."  *Id.*, at 1030.

The new UNE loop rates adopted by the NPSC were calculated in four steps: First, the previously approved UNE loop rates (of $12.14, $28.11, and $62.49) were multiplied by the total number of residential and business lines in each zone that were served by Qwest and available to competitors for leasing in December 2006.  This computation resulted in a "maximum UNE loop revenue at current rates" for each of the three rate zones.[17]  *See id.*, Attachment A, line 3.  Second, the SAM expected loop costs[18] for each of the six subzones (which ranged from $14.71 for in-town Zone 1 to $303.90 for out-of-town Zone 3) were multiplied by the total number of residential and business access lines in each subzone.  This computation resulted in a "household weighted expected loop cost" for each of the six subzones.[19]  *See id.*, Attachment A, line 6.  Third, these step-two figures were expressed as a percentage of the total expected costs in the three existing rate zones.  In Zone 3, for example, in-town lines accounted for 14.33% of the total expected costs, while out-of-town lines accounted for 85.67%.  These percentages were then multiplied times the maximum revenue figures of step one, thereby allocating the revenue in each zone between in-town and out-of-town subzones; the three in-town subzones were combined, however.  *See id.*, Attachment A, lines 8, 9.  Fourth, and finally, the step-three revenue figures were

_____

[17] $3,061,307 in Zone 1 (46% of the total "maximum revenue" of $6,627,229); $1,242,856 in Zone 2 (19%); and $2,323,066 in Zone 3 (35%).

[18] See the discussion in part I.B above.

[19] $3,516,407 in-town plus $666,476 out-of-town in Zone 1 (43% of the total "expected cost" of $9,733,236); $597,707 in-town plus $1,613,808 out-of-town in Zone 2 (23%); and $478,337 in-town plus $2,860,231 out-of-town  in Zone 3 (34%).

11

divided by the step-two line numbers to arrive at the new UNE loop rates of $10.76, $37.04, $95.32, and $210.90. *See id.*, Attachment A, line 11. The following table compares the new UNE loop rates to the rates that were proposed by Qwest and approved by the NPSC in June 2002:

|  | Zone 1 | | Zone 2 | | Zone 3 | |
|  | In-Town | Out | In-Town | Out | In-Town | Out |
|---|---|---|---|---|---|---|
| New UNE loop rate | $10.76 | $37.04 | $10.76 | $95.32 | $10.76 | $210.90 |
| Old UNE loop rate | $12.14 | $12.14 | $28.11 | $28.11 | $62.49 | $62.49 |
| Difference | ($1.38) | $24.90 | ($15.35) | $67.21 | ($51.73) | $148.41 |

## II. DISCUSSION

The present action was filed by Qwest on November 9, 2007. Although the new UNE loop rates were scheduled to go into effect on July 1, 2008, the NPSC determined on February 26, 2008, to stay the October 10, 2007 rate order pending entry of a final order by the court in this action. *See* NUSF-50 & C-3554 Dockets, Order on Motions (Feb. 26, 2008), Administrative Record at 1247-48 (Exhibit AAA). In a Rule 26(f) report filed on April 2, 2008, the parties "agreed that this action is similar to an appellate proceeding and the Commission's action should be reviewed based on the record made below." (Filing 30, at CM/ECF p. 1.) Accordingly, the court established deadlines for the parties to file a stipulated administrative record and briefs. (*See* filing 31.) The record was filed on April 17, 2008, and all briefing was completed on August 8, 2008.

### A. Standard of Review

The Nebraska Public Service Commission's factual determinations and mixed questions of law and fact are subject to a deferential standard of review, and must be affirmed unless the Commission's decision is arbitrary and capricious. *See WWC License, L.L.C. v. Boyle, 459 F.3d 880, 889 (8th Cir. 2006)* (citing *Qwest v.*

*Koppendrayer*, 436 F.3d at 863).  This scope of review is narrow and a court is not to substitute its judgment for that of the agency.  *Connect Communications Corp. v. Southwestern Bell Telephone, L.P.*, 467 F.3d 703, 711 (8th Cir. 2006).  The state agency must, however, "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

No deference is owed to the NPSC's interpretations of federal law, as review of the rate order for compliance with the Telecommunications Act of 1996 is de novo. *See WWC License*, 459 F.3d at 890.  In a court's interpretation of the Act, however, deference is owed to the Federal Communications Commission based on the fact that Congress expressly charged the FCC with the duty to promulgate regulations to interpret and carry out the Act. *See id.* (citing *AT&T Corp. v. Iowa Utils. Bd.*, 525 U.S. at 378).

## B. Cost Study Requirement

Qwest complains that the NPSC radically revised its rates without the benefit of a TELRIC-compliant cost study.  The NPSC maintains that no new cost study was needed, and that the rates are proper, "[b]ecause the [NPSC] Staff [proposal] begins with already established TELRIC rates [from the C-2516 Docket] and uses regression results from a TELRIC model [approved in the NUSF-26 Docket] to further deaverage those TELRIC rates[.]"  Rate Order (Exhibit TT), p 6, Administrative Record at 1025.[20]

---

[20] Unbundled network element rates must be geographically deaveraged into a minimum of three cost-related zones.  *See* 47 C.F.R. § 51.507(f).

Geographic deaveraging refers to charging different rates in different zones to reflect the relative costs of providing service in each

The FCC declared in its Local Competition Order that "[i]n setting a rate pursuant to the cost-based pricing methodology, . . . the state must give full and fair effect to the economic costing methodology we set forth in this Order and must create a factual record, including the cost study, sufficient for purposes of review after notice and opportunity for the affected parties to participate." 11 F.C.C.R. at 15,812 ¶ 619. FCC regulations also provide that "[t]he record of any state proceeding in

---

zone. Since 1992, the [Federal Communications] Commission has permitted incumbent LECs to deaverage certain rates by geographic zone because of the concern that averaged rates might create a pricing umbrella for competitors that would deprive subscribers of the benefits of more vigorous competition.  [The FCC] also [has] ordered the deaveraging of the rates for interconnection and unbundled elements, and permitted deaveraging of rates for trunking services as well.  In doing so, [the FCC] found that deaveraging reduces implicit support inherent in some rates and helps promote competition in both low-cost and high-cost areas whereas averaging across large geographic areas may distort the operation of markets in high-cost areas because it requires incumbent LECs to offer services in those areas at prices substantially lower than their costs of providing services. [The FCC] found that deaveraged rates more closely reflect the actual cost of providing service, which promotes competition and efficiency by allowing a LEC to compete for subscribers when it is the lowest cost service provider, and by removing support flows to the LEC's higher-cost services. Prices that are below cost reduce the incentives for entry by firms that could provide the services as efficiently, or more efficiently, than the incumbent LEC.  Similarly, discrepancies between price and cost may create incentives for carriers to enter low-cost areas even if their cost of providing service is actually higher than that of the incumbent LEC.

*In the Matter of Access Charge Reform Price Cap Performance Review for Local Exchange Carriers*, 15 F.C.C.R. 12,962, 13,007-08, ¶ 114 (FCC  May 31, 2000) (footnotes omitted), *rev'd in part on other grounds*, *Texas Office of Public Utility Counsel v. FCC*, 265 F.3d 313 (5th Cir. 2001).

which a state commission considers a cost study for purposes of establishing rates under [§ 51.505] shall include any such cost study." 47 C.F.R. § 51.505(e)(2).

"An incumbent LEC must prove to the state commission that the rates for each [network] element it offers do not exceed the forward-looking economic cost per unit of providing the element, using a cost study that complies with the methodology set forth in [§ 51.505] and § 51.511." 47 C.F.R. § 51.505(e).   "The forward-looking economic cost per unit of an element equals the forward-looking economic cost of the element, as defined in § 51.505, divided by a reasonable projection of the sum of the total number of units of the element that the incumbent LEC is likely to provide to requesting telecommunications carriers and the total number of units of the element that the incumbent LEC is likely to use in offering its own services, during a reasonable measuring period." 47 C.F.R. § 51.511(a).

Qwest actually prepared a cost study for the C-3554 Docket, using the very same methodology that the NPSC had employed 5 years earlier in the C-2516 Docket. Using updated cost and line count information, Qwest's expert computed that the forward-looking economic cost per unit of providing the loops had increased to the following amounts (based on the averages of HAI, HCPM, and BCPM cost study results): Zone 1, $28.16 (compared to $15.14 in 2002); Zone 2, $46.19 (compared to $35.05 in 2002); and Zone 3, $93.97 (compared to $77.92 in 2002). *See* Transcript Exhibit 8, p. 17, Administrative Record at 792. The NPSC decided to ignore this evidence, stating only that "if Qwest would like the Commission to revisit the UNE rates established in Docket C-2516, Qwest should file a request for the Commission to open a proceeding to determine whether the rates established in Docket C-2516 should be reviewed in light of alleged rising costs, evolution in technology, increases in competition and other market changes. For the purposes of this proceeding, however, the Commission finds it appropriate to utilize the rates which became effective and are still in effect from the Docket C-2516 as a baseline for the

15

deaveraging of loop rates into an appropriate number of zones." Rate Order (Exhibit
TT), pp. 5-6, Administrative Record at 1024-25.

I agree with the NPSC that it was not the purpose of the C-3554 Docket to
determine if Qwest was entitled to increase its UNE loop rates. As stated by the
Commission in its February 28, 2006 order opening this administrative proceeding,
it was "asked to reevaluate the zoning scheme set out in Docket No. C-2516 in light
of Nebraska Universal Fund (NUSF) Department Order NUSF-26 findings and
conclusions." Exhibit H, pp. 1-2, Administrative Record at 156-57. "Commission
staff propose[d] modifying the zones as set forth in Exhibit A attached [to the order]"
to establish "in-town" and "out-of-town" rates of $10.97 and $31.53, respectively, in
Zone 1; of $9.33 and $93.19, respectively, in Zone 2; and of $9.93 and $172.95,
respectively, in Zone 3. Exhibit H, p. 2 & Ex. A, Administrative Record at 157, 159.
The staff's "Unifying Method (UM)" calculated the proposed UNE loop (or UNE-L)
rates for Qwest in the following manner:

> The UM determines UNE-L rates for in-town and out-of-town
> areas, as defined in NUSF-26. The proposed methodology first
> calculates a measure of total UNE-L revenue. This measure is based on
> effective UNE-L rates, zones as determined in C-2516, and total area
> residential access lines.[21] The measure of UNE-L revenue is then
> allocated, by zone, to in-town and out-of-town areas. The in-town/out-
> of-town bifurcation is accomplished through the application of factors
> developed utilizing NUSF-26 data and results.

> Once in-town and out-of-town total UNE-L revenue amounts are
> determined for each zone; per-line UNE-L rates, for each in-town zone
> area and out-of-town zone area, are determined using the respective
> access line counts and employing simple division.

Exhibit H, p. 2, Administrative Record at 157 (footnotes omitted).

--------

[21] As discussed above, the NPSC later included business access lines.

In the C-3554 Docket, therefore, the NPSC opened a public investigation, and requested comments, on just three issues: (1) "Whether the Commission has the requisite authority to create more than the three zones implemented in C-2516?" (2) "Whether the above UM is sound methodology or should [it] be modified and/or changed?" (3) "Whether an alternative methodology or methodologies would be preferable to the staff's proposals?" Exhibit H, pp. 2-3, Administrative Record at 157-58.

The NPSC answered the first question in the affirmative, stating:

Clearly, the FCC acknowledged that service within a rural area of the state may cost more to provide than in a non-rural area in that state. In its Local Competition Order, the FCC delegated to state commissions the latitude to determine how to establish geographic zones reflecting different cost characteristics. The FCC requires state commissions to establish at least three cost-related zones. However, a state commission "may establish more than three zones where cost differences in geographic regions are such that it finds that additional zones are needed to adequately reflect the costs of interconnection and access to unbundled elements." The Commission possesses broad discretion to decide whether the zones should be based on these rural/non-rural distinctions and based on population density.

Rate Order (Exhibit TT), pp. 7-8, Administrative Record at 1026-27 (footnote omitted). I have no disagreement with this interpretation of the Act and applicable FCC regulations. "The only requirements imposed by [47 C.F.R. § 51.507(f)] are (1) that the [rate deaveraging] method must be based on 'geographic areas within the state,' (2) the method must 'reflect geographic cost differences,' and (3) there must be 'a minimum of three cost-related rate zones.'" *MCI Worldcom Communications, Inc. v. BellSouth Telecommunications, Inc.*, 446 F.3d 1164, 1177 (11th Cir. 2006). The FCC "allow[s] states to determine the number of density zones within the state, provided that they designate at least three zones, but require[s] that in all cases the weighted average of unbundled loop prices, with weights equal to the number of

loops in each zone, should be less than the proxy ceiling set for the statewide average loop cost [by the FCC (which, for Nebraska, is $18.05)]." Local Competition Order, 11 F.C.C.R. at 15,898, 16,238, ¶ 797 & Appx. D.

The NPSC also concluded that "nothing in the FCC rules regarding TELRIC pricing and deaveraging forbids state commissions from deaveraging at a sub-wire center level." Rate Order (Exhibit TT), p. 8, Administrative Record at 1027. Again, I have no disagreement with this legal conclusion. The total element long-run incremental cost for a local loop is to be measured "given the existing location of the incumbent LEC's wire centers," 47 C.F.R. § 51.505(b)(1), but there is no statutory or regulatory requirement that all local loops within the boundaries of a single wire center must be made available for leasing at the same rate.[22] It must be emphasized,

---

[22] While recognizing that the FCC has warned against "extrapolating from statements made in the context of universal service funding," *In re Review of Commission's Rules Regarding the Pricing of Unbundled Network Elements*, 18 F.C.C.R. 18,945, 18,963, ¶ 47 (FCC Sept. 15, 2003), I note that the FCC has given ILECs the option to self-certify that they will "disaggregate[ ] [federal high-cost universal service] support into no more than two cost zones per wire center." 47 C.F.R. § 54.315(d)(1)(ii).

> [A] rural carrier's wire center typically serves a small town and the surrounding agricultural areas. The cost of serving the town is significantly lower than the cost of serving the agricultural areas because of differences in population density and the distances of customers from the wire center. It is reasonable to expect that if two zones are developed, they would reflect the cost differences between serving the town and serving the agricultural areas respectively. If a carrier were to develop two zones in a manner that did not reflect these cost differences, the per-line support amount would not be related to the relative cost of serving the customer. This would result in the delivery of excessive support to one zone and thereby create an artificial incentive for a competitive carrier to enter in order to receive support in excess of its cost to serve the customer. Such a result is contrary to the incumbent

18

however, that the geographically deaveraged rates still need to be "cost-based."  *See* Local Competition Order, 11 F.C.C.R. at 15,898, ¶ 797.  In particular, the FCC has ruled "that states should use a TELRIC methodology to establish geographically deaveraged, flat-rate charges for access to unbundled loops." *Id.* at 15,893-94, ¶ 790. "Where costs differ, rate differences that *accurately* reflect those differences are not discriminatory."  *Id.* at 15,929, ¶ 860 (emphasis supplied).  On the other hand, "the nondiscrimination provisions in the Act prohibit price differences that are not based on cost differences."  *Id.* at 16,168, ¶1399.

Whether the NPSC's modified Unifying Method ("UM") results in cost-based rates is doubtful.  This is a mixed question of law and fact, however, so the "arbitrary and capricious" standard of review applies.  Even though it is still a close question, I will defer to the NPSC's judgment, confident that it will take prompt corrective action in the event the marketplace discloses that there is a imbalance between rates and costs in any zone—for example, if CLECs significantly increase their leasing of in-town loops while leaving it to Qwest to serve the higher-cost customers.[23]

The starting point for the UM is the existing rate structure.  The existing rates, it will be recalled, are 20% less than the rates that were computed by the NPSC after averaging the results of three different TELRIC-compliant cost studies in April 2002.

---

carrier's interest. Given this outcome, [the FCC] believe[d] that less regulatory oversight [was] warranted as an initial matter with regard to developing two zones below the wire center level . . ..

*In re Federal-State Joint Bd. on Universal Service*, 16 F.C.C.R. 11244, 11306, ¶ 157 (FCC May 23, 2001).

[23] Regardless of the cost of service, Qwest is required to serve residential customers at a statewide rate of $18.15 per month.  *See* Rate Order (Exhibit TT), p. 4, Administrative Record at 1023; Qwest's Brief (filing 33), at CM/ECF p. 48; NPSC's Brief (filing 37), at CM/ECF p. 33.

While this suggests to me that the new UNE loop rates, in the aggregate, must also be 20% below the TELRIC (based on 2002 costs), and that a more reasonable starting point for the UM would be the rates that were derived from the cost studies, the NPSC found that "[a]though Qwest voluntarily reduced the rates established by the Commission, all parties agreed that the effective rates were TELRIC-based."  Rate Order (Exhibit TT), p. 7, Administrative Record at p. 1026 (footnote omitted).  "In addition," the NPSC noted, "the FCC endorsed the rates as being TELRIC based when it issued its order granting §271 approval to Qwest."  *Id.*  This is a rational explanation for the choice that was made by the NPSC.  "Because [the TELRIC ratesetting] endeavor is hypothetical and prospective, it is impossible to find 'right' answers; there are only better and worse estimates." *MPower Communications Corp. v. Illinois Bell Telephone Co.*, 457 F.3d 625, 630 (7th Cir. 2006).

Using the existing rates, NPSC staff next calculated the "maximum UNE loop revenue" for each zone by multiplying the total number of access lines times the applicable rate.  Qwest argues that this calculation demonstrates that the UM is not a cost-based methodology, but this argument is disingenuous.  Assuming that the existing rates are equal to the TELRIC for each loop, the terms "revenue" and "cost" can be used interchangeably in this instance.  *See* Transcript, 51:14-52:1, Administrative Record at 491-92.  While it is true that no cost study was performed by the NPSC staff as part of the C-3554 Docket, and that Qwest's cost study was rejected out-of-hand by the NPSC, I cannot conclude that this ratesetting proceeding violated federal law.  The C-3544 Docket essentially was a reopening of the C-2516 Docket.  The sole purpose of the proceeding was to make the rate zones conform to the areas that were designated in the NUSF-26 Docket.  While a division of the zones into "in-town" and "out-of-town" areas necessitated a change in rates, the loop costs that were used in the rate calculation remained unchanged.

The real issue is whether it makes sense in a ratesetting context to apply the "household density" allocation formula that was utilized in the NUSF-26 Docket for

20

redistributing universal service support funds.  The NPSC determined "that the Staff deaveraging proposal produces a sufficiently accurate method for deaveraging costs based on geographic variations."  Rate Order (Exhibit TT), p. 9, Administrative Record at 1028.  In making this determination, the NPSC accepted the testimony of its staff that "the density-based regression results in approximately 80 percent of the variation in the underlying data."  *Id.*, p. 8, Administrative Record at 1027 (footnote omitted).[24]  Qwest's expert testified that "the Staff's methodology misses the BCPM's wire center loop cost estimate [excluding Omaha wire centers] by an average of 35 percent."  Transcript, Exhibit 10, pp. 25-26, Administrative Record at 900-01.  Even though the NPSC did not specifically mention the latter testimony in the rate order,[25] its decision to deaverage Qwest's loop rates based on the single most significant cost variable (*i.e.*, household density) was not arbitrary and capricious.  *See Qwest Corp. v. Koppendrayer*, 436 F.3d at 871 (although administrative law judge and Minnesota Public Utilities Commission "could have provided more detail in explaining their decision to adopt the HAI Model, they were not arbitrary and capricious merely because they chose the explanation and methodology of one expert over another.").

Qwest also complains that the NPSC, by defining "in-town" areas as "cities, villages or unincorporated areas with 20 or more households and densities greater

---

[24]  Staff testified that the coefficient of determination ($R^2$), when calculated using loop cost estimates, was 0.78.  Transcript, 270:23-271:5, Administrative Record at 711-12.

[25]  The NPSC noted, however, that "Qwest argues the Staff proposal is statistically inaccurate and inappropriate.  Qwest argues that a 'twenty-two percent loss of accuracy is unacceptable.'  Qwest states that the deaveraging results are not reasonably aligned with results the BCPM would produce; accordingly, according to Qwest's witness the disaggregation process is not credible. [Qwest's witness] discussed in his slides the various points where the Staff deaveraging results are not aligned with the results the BCPM would produce."  Rate Order (Exhibit TT), p. 9, Administrative Record at 1028 (footnotes omitted).

than 42 households per square mile," Rate Order (Exhibit TT), p. 11, Administrative Record at 1030, and "out-of-town" areas as "the remaining areas that have not been assigned to a town," *id.*, failed to provide a workable method for identifying which rate zone applies to a home or business that is located at the edge of town.  This is a legitimate concern because, as demonstrated by Qwest in motioning the NPSC for a rehearing and reconsideration of the rate order on November 13, 2007 (Exhibit UU), the NUSF-26 distribution model that Qwest was directed to use in implementing the rate order does not contain a record of the census block information that was used by the NPSC staff to divide unincorporated areas on the basis of household density.[26] *See* Affidavit of Peter Copeland in Support of Qwest Corporation's Motion for Rehearing and Reconsideration (Exhibit VV), ¶¶ 6, 7, Administrative Record at pp. 1042-43.  *See also* Declaration of Peter Copeland in Support of Qwest Corporation's Motion for Preliminary Injunction (filing 7-4, ¶¶ 11-24, at CM/ECF pp. 5-12), also attached to Qwest Corporation's Clarifying Statement Regarding Its Motion for Clarification, Modification, or Waiver, or to Stay Implementation Pending Resolution of Federal Court Challenge (Exhibit YY), Administrative Record at pp. 1073-80.

The NPSC denied Qwest's motion for rehearing and reconsideration as untimely, but on February 26, 2008, it granted in part a subsequently filed motion for clarification in which Qwest renewed a request "that it be allowed to use municipal tax information in its existing billing systems to provide a substitute for the [NUSF-26 distribution model] methodology proposed by the Commission in its October 10 Order."  Qwest Corporation's Motion for Clarification, Modification, or Waiver, or to Stay Implementation Pending Resolution of Federal Court Challenge (Exhibit XX), Administrative Record at pp. 1-2.  The NPSC granted the renewed request after finding that "Qwest can use the municipal tax information for the

---

[26] Although not argued by Qwest, I also question whether a rate zone that cannot reliably be drawn on a map is a "defined geographic area" within the meaning of 47 C.F.R. § 51.507(f).

implementation of this proceeding and still be consistent with the Commission's October 10, 2007, decision to create a more unified and competitively neutral framework." *In the Matter of the Commission, on its own motion, seeking to investigate whether the zones established in Docket No. C-2516 are appropriate in light of NUSF-26 findings and conclusions*, Application No. C-3554/PI-112, Order on Motions (Feb. 26, 2008), Administrative Record at 1247 (Exhibit AAA). While Qwest argues that the NPSC's decision to grant the requested modification to the Rate Order was arbitrary and capricious, because the NPSC has not even seen the municipal tax information in Qwest's billing system, it is fundamental that where a party has "opened the door" and "invited error" there can be no reversible error. *See Dillon v. Nissan Motor Co., Ltd., 986 F.2d 263, 269-70 (8th Cir. 1993)*. I therefore find that the modified method for implementation of Qwest's new UNE loop rates, using municipal tax information to identify "in-town" and "out-of-town" areas, does not violate Sections 251 and 252 of the Telecommunications Act of 1996.

In its February 26th order, the NPSC also provided that "[i]n the event the District Court affirms the Commission's decision, the Commission, within 14 days of such Order, will schedule a hearing on implementation issues to make a determination of the earliest practical implementation date for all parties affected by this proceeding." Exhibit AAA, p. 2, Administrative Record at 1248. The defendants represent that this hearing will address Qwest's further request that it be allowed to recover the costs of implementing the new UNE loop rates. *See* Defendants' Brief (filing 37), at CM/ECF p. 34. That being the case, any claim made by Qwest in the present action for recovery of those costs is not ripe for determination, and will be dismissed for lack of subject matter jurisdiction.[27] *See Nebraska Public Power Dist.*

---

[27] In paragraph 40 of the amended complaint, Qwest alleges: "It would be a substantial undertaking to build the Commission's in-town and out-of-town criteria into Qwest's wholesale billing and inventory systems and to make the systems capable of determining whether the Commission's in-town or out-of-town rates apply to individual loops. For this reason, Qwest requested that the Commission provide

*v. MidAmerican Energy Co.*, 234 F.3d 1032, 1038 (8th Cir. 2000) (the "fitness for judicial decision" prong of ripeness inquiry goes to a court's ability to visit an issue; in appeals from administrative regulation, the fitness prong questions finality and exhaustion, but more generally, it safeguards against judicial review of hypothetical or speculative disagreements.").

### C.  Nondiscriminatory Rates Requirement

Section 251 of the Telecommunications Act of 1996 states that ILECs must provide competing carriers with "nondiscriminatory access to network elements on an unbundled basis . . . on rates, terms, and conditions that are just, reasonable, and nondiscriminatory." 47 U.S.C. § 251(c)(3).  Section 252 of the Act states that the "[d]eterminations by a State commission of . . . the just and reasonable rate for network elements for purposes of [§ 251(c)(3)] . . . shall be nondiscriminatory[.]" 47 U.S.C. § 252(d)(1)(A)(ii).  Qwest alleges that the NPSC violated the Act's requirement of nondiscriminatory rates "by exempting all other Nebraska ILECs from its rate deaveraging scheme for UNE loops[.]" Amended Complaint (filing 4), ¶ 51, at CM/ECF p. 20.  I find no merit to this claim.

No ILECs were "exempted" from the rate order.  The C-3554 Docket was opened for the limited purpose of "reevaluat[ing] the zoning scheme set out in Docket No. 2516[.]" Exhibit H, p. 1, Administrative Record at 156.  The C-2516 Docket was concerned solely with "establish[ing] rates for interconnection, unbundled elements, transport and termination, and resale services for US West Communications, Inc., now known as Qwest Corporation (Qwest)."  Exhibit A, p. 3, Administrative Record at 3; Exhibit B, p. 1, Administrative Record at 62.  The rate order also states that

---

a mechanism for Qwest to recover the costs of changing its systems to implement the new rate structure, consistent with Qwest's right under Section 252(c)(2) to recover the costs of providing access to UNEs."  (Filing 4, ¶ 40, at CM/ECF p. 17.) This allegation is incorporated by reference in paragraph 45 of count I.

while it "deaverages cost differences in Qwest's ILEC territory only[,]" the NPSC "may at a later time open a proceeding to review or deaverage loop rates for other carriers where it finds such action would be appropriate."  Rate Order (Exhibit TT), p. 13, Administrative Record at 1032.  Qwest cites no authority for the proposition that the Act requires a State commission to set or adjust the rates of all ILECs simultaneously.  In fact, it does not appear that Qwest raised any objection to the special setting of its rates in the C-2516 Docket.

### D. Discrimination Against Rural Areas

Qwest also claims that the new UNE loop rates are discriminatory under Section 254 of the Act, which states that "[c]onsumers in all regions of the Nation, including low-income consumers and those in rural, insular, and high cost areas, should have access to telecommunications and information services . . . that are reasonably comparable to those services provided in urban areas and that are available at rates that are reasonably comparable to rates charged for similar services in urban areas."  47 U.S.C. § 254(b)(3).  This statement, however, is just one of several "universal service principles" that the FCC and a Federal-State Joint Board must follow when establishing "policies for the preservation and advancement of universal service."  47 U.S.C. § 254(b).  It has no bearing upon a State commission setting rates under Sections 251 and 252 of the Act.[28]

### E.  Due Process

Qwest alleges that the NPSC denied it due process "by failing to give proper consideration to evidence demonstrating the flawed, inaccurate results of Staff's

---

[28] Similar language is contained in the declaration of legislative policy for the Nebraska Telecommunications Universal Service Fund Act.  *See* Neb. Rev. Stat. § 86-323(3).  It likewise has no application here.

mathematical methodology[,]" "by failing to address the problems Qwest identified relating to implementation of the new loop rates[,]" and " by failing to consider or rule upon Qwest's request to be compensated for the costs of implementing the Order."   Amended Complaint (filing 4), ¶¶ 58, 60, at CM/ECF pp. 21-22.  It is claimed that "the Commission's failure to give meaningful consideration to Qwest's expert testimony . . . deprived Qwest of its property interests without affording the substantive and procedural due process protections guaranteed by the Constitution." *Id.*, ¶ 59, at CM/ECF p. 22.  Qwest's briefs contain no mention of these due process claims, however.  I therefore deem the claims to have been abandoned.

In any event, I perceive no due process violation.  While I assume that procedural due process protections attached to the C-3554 Docket, *see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 542 (1978) ("In prior opinions we have intimated that even in a rulemaking proceeding when an agency is making a quasi-judicial determination by which a very small number of persons are exceptionally affected, in each case upon individual grounds, in some circumstances additional procedures may be required in order to afford the aggrieved individuals due process.") (internal quotations omitted), it does not appear that Qwest was denied "the fundamental fairness that is required in administrative hearings by the due process clause[.]"   *Midland Banana & Tomato Co., Inc. v. U.S. Dept. of Agriculture*, 104 F.3d 139, 142 (8th Cir. 1997).

Under the rubric of substantive due process, the Fourteenth Amendment "protects individual liberty [and property interests] against certain government actions regardless of the fairness of the procedures used to implement them." *Ganley v. Minneapolis Park and Recreation Bd.*, 491 F.3d 743, 749 (8th Cir. 2007) (internal quotations and citations omitted).  To establish its claim, the burden is on Qwest to show that the government action complained of "is truly irrational, that is something more than . . . arbitrary, capricious, or in violation of state law."   *Id.* (internal quotations and citations omitted).  Qwest clearly has not met this burden.

### F. Equal Protection

Qwest also alleges that it was denied equal protection of the laws by the NPSC "requiring Qwest to deaverage loop rates, but exempting all other Nebraska ILECs from the deaveraging requirement." Amended Complaint (filing 4), ¶ 62, at CM/ECF p. 22. I must again reject the allegation that other ILECs were "exempted" from the rate order. (See the discussion in part II.B above.) Consequently, I will deny this constitutional claim on the merits.[29]

"In general, the Equal Protection Clause requires that state actors treat similarly situated people alike." *Habhab v. Hon*, 536 F.3d 963, 967 (8th Cir.2008) (quoting *Bogren v. Minnesota*, 236 F.3d 399, 408 (8th Cir.2000)). "State actors may, however, treat dissimilarly situated people dissimilarly without running afoul of the protections afforded by the clause." *Id.* In other words, the Equal Protection Clause "embodies a general rule that States must treat like cases alike but may treat unlike cases accordingly." *Vacco v. Quill*, 521 U.S. 793, 799 (1997).[30]

Because Qwest was the only ILEC to have its UNE loop rates set by the NPSC in the C-2516 Docket, Qwest was not "similarly situated" to any other carrier when the NPSC subsequently decided to deaverage those rates in the C-3554 Docket. Any

---

[29] The defendants argue that Qwest should not be allowed to raise an equal protection claim "for the first time on appeal[,]" Defendants' brief (filing 37), at CM/ECF p. 31, but I conclude that Qwest was not required to assert such a claim before the NPSC. "Constitutional questions obviously are unsuited to resolution in administrative hearing procedures[.]" *Califano v. Sanders*, 430 U.S. 99, 109 (1977).

[30] Even in like cases, "the State need only show that the differential treatment is rationally related to a legitimate state interest." *Executive Air Taxi Corp. v. City of Bismarck*, 518 F.3d 562, 566 (8th Cir. 2008) (citing *Vacco*, 521 U.S. at 799). I do not reach this second prong of the equal protection analysis.

equal protection challenge by Qwest should have been brought when its rates were set initially, not 5 years later when those rates were realigned.

## G. *Nebraska Administrative Procedure Act*

For its final claim, Qwest alleges that the NPSC "engaged in arbitrary and capricious decision-making in violation of the Nebraska Administrative Procedures [sic] Act by ordering Qwest to enact the deaveraged rates in a manner that cannot be implemented." Amended Complaint (filing 4), ¶ 64, at CM/ECF p. 23. This claim is only discussed in two footnotes in Qwest's brief (filing 33, at CM/ECF p. 41), and I likewise will give it short shrift because the Supreme Court has made it clear that federal courts do not have the authority to compel state officials to comply with state law. *See Pennhurst State School & Hosp. v. Halderman, 465 U.S. 89, 106 (1984)* ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").[31] This claim will be dismissed for lack of jurisdiction.

## III. CONCLUSION

The Nebraska Public Service Commission's October 10, 2007 rate order, as modified on February 26, 2008, does not violate the Telecommunications Act of 1996, or applicable FCC regulations. The Commission's ratesetting decision also was not arbitrary and capricious. Qwest has not been denied due process or equal protection of the laws.

---

[31] The defendants allege in their answer that the Nebraska APA claim is barred by the Eleventh Amendment (filing 28, at CM/ECF p. 12), although their brief contains no mention of this affirmative defense.

To the extent Qwest claims that it should be allowed to recover its costs of implementing the new UNE loop rates, such claim is not ripe and will be dismissed for lack of jurisdiction. Any claim arising under the Nebraska Administrative Procedure Act will also be dismissed for lack of jurisdiction, because it is barred by the State's Eleventh Amendment immunity.

Accordingly,

IT IS ORDERED that:

1.  The plaintiff's "motion for leave to supplement record with declaration of Peter Copeland" (filing 39) is denied.

2.  The plaintiff's claim that it should be allowed to recover its costs of implementing the Nebraska Public Service Commission's rate order, as alleged in paragraphs 40 and 45 of the amended complaint (filing 4), is dismissed, without prejudice, for lack of subject matter jurisdiction because the claim is not ripe for determination.

3.  The plaintiff's claim that the defendants violated the Nebraska Administrative Procedure Act, as alleged in paragraphs 63 through 67 (count V) of the amended complaint, is dismissed, without prejudice, for lack of subject matter jurisdiction because the claim is barred by the State's Eleventh Amendment immunity.

4.  On all other claims the court finds in favor of the defendants and against the plaintiff, and the Nebraska Public Service Commission's October 10, 2007 rate order, as modified on February 26, 2008, is hereby affirmed.

29

5.    A final judgment in conformity with the foregoing will be entered by
      separate document.

November 7, 2008.                    BY THE COURT:

                                     s/ *Richard G. Kopf*
                                     United States District Judge